Filed 12/15/25  P. v. Osotonu CA1/3
**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br>v.<br>LOTU TATAGAMATAU OSOTONU,<br>        Defendant and Appellant. | A169562<br><br>(Napa County Superior Ct.<br>No. 23CR000952) |

A jury convicted defendant of several offenses, including possession of a controlled substance with a firearm and possession of a controlled substance for sale.  On appeal, defendant contends the trial court erred in denying suppression of all evidence of contraband seized from his person and his car and in denying his motion to dismiss a 1997 strike prior conviction pursuant to *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*) and section 1385 of the Penal Code (all unlabeled statutory provisions are to this code).  We shall affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

In April 2023, defendant was pulled over by two peace officers who saw him driving a vehicle with no front license plate.  Upon making contact with defendant, Officer Keoni Piceno observed signs that defendant appeared to be under the influence of something.  As will be described in more detail, *post*, Piceno conducted a consent search and found methamphetamine and a

1

marijuana pen in defendant's front right pants pocket and a loaded gun in his front left pants pocket. In searches of defendant's car, officers found a box of ammunition and 58.740 grams of methamphetamine. The trial court denied defendant's pretrial motion to suppress all such evidence as the fruit of an illegal search.

In November 2023, a jury convicted defendant of possession of a controlled substance with a firearm (Health & Saf. Code, § 11370.1, subd. (a); count 1); possession of a firearm by a convicted felon (§ 29800, subd. (a)(1); count 2); possession of ammunition by a prohibited person (§ 30305, subd. (a); count 3); transportation of a controlled substance (Health & Saf. Code, § 11379, subd. (a); count 4); and possession of a controlled substance for sale (Health & Saf. Code, § 11378, subd. (a); count 5). The jury also found true a 1997 strike prior conviction allegation (§ 667, subds. (b)–(i)) and various aggravating factors under rule 4.421 of the California Rules of Court.

Defendant subsequently filed a motion to dismiss his 1997 strike prior pursuant to *Romero*, *supra*, 13 Cal.4th 497, and section 1385 ("*Romero* motion"). He also requested an opportunity to participate in Drug Court. The trial court denied both requests and ultimately sentenced defendant to an aggregate sentence of six years in prison.[1]

---

[1] The aggregate six-year sentence broke down as follows: (1) mid-term of three years on methamphetamine possession with a firearm in count 1, doubled to six years based on the strike prior; (2) mid-term of two years for felon in possession of a firearm in count 2, doubled to four years based on the strike prior and stayed pursuant to section 654; (3) mid-term of two years for prohibited person in possession of a firearm in count 3, doubled to four years based on the strike prior and concurrent to count 1; (4) mid-term of two years for transportation/sale of meth in count 4, doubled to four years based on the strike prior and stayed pursuant to section 654; (5) mid-term of two years for possession for sale of meth in count 5, doubled to four years based on the strike prior and stayed pursuant to section 654.

DISCUSSION

On appeal, defendant contends the trial court erred in denying suppression of the contraband seized from his person and his car and in denying his *Romero* motion to dismiss his 1997 strike prior. We address these contentions in turn.

## A. Suppression Motion

In challenging the denial of his suppression motion, defendant contends (1) the traffic stop was unlawfully prolonged; (2) his consent to the search of his person was unlawfully obtained and invalid; and (3) the search of his person was not otherwise supported for officer safety reasons. The People disagree, as do we.

### 1. Circumstances Surrounding the Search

The evidence at the suppression hearing consisted of Officer Piceno's testimony, as well as video of the traffic stop recorded by his bodyworn camera ("BWC").

Officer Piceno and his partner observed defendant driving a car with no front license plate in violation of the Vehicle Code. Piceno initiated a traffic stop, activated his BWC, and approached defendant's car. Piceno informed defendant that he stopped the car because of the license plate violation. Piceno observed defendant was visibly sweating and had "glassy, watery eyes" and a "brown or burnt type substance" on his fingertips. Based on his experience in the field, as well as his training in field sobriety testing and in identifying individuals who may be impaired by controlled substances, Piceno immediately suspected that defendant was under the influence of a controlled substance. Piceno asked for defendant's driver's license and vehicle registration. Defendant produced a California Identification Card and the

registration paperwork, and Piceno ran defendant's information through dispatch.

As he checked defendant's identification and registration and waited for information from dispatch, Officer Piceno engaged defendant in conversation and asked various questions. Among other things, Piceno asked defendant whether he was on probation or parole, to which defendant replied he was not. When asked, defendant admitted he had previously been arrested for both drug possession and gun possession. He denied having anything illegal in the car and declined Piceno's request for consent to "search [his] car to make sure." When defendant said "no" to the search request, Piceno responded, "Okay. No worries."

Officer Piceno then went to his patrol car and heard from dispatch that defendant's paperwork was valid and he was not on probation. By that point, however, Piceno had already decided to investigate whether defendant had been driving under the influence ("DUI"). He returned to defendant's car and asked defendant a series of questions about his last time in prison, drug use, probation status, and whether any "meth" or weapons were in the car. Defendant said he last used drugs three months before, and his preferred drug was marijuana. He claimed he did not use methamphetamine and denied he had any methamphetamine in the car or on his person. Piceno said he was trying to figure out what was going on, and again asked if defendant was on active probation, to which defendant again said no. When asked, defendant said he was last arrested "three weeks ago" for a dispute with his girlfriend. Piceno again asked if defendant had any meth or weapons in the car, and defendant again said no. Piceno then told defendant he was going to pull him "out" of the car and check his eyes "real quick" to make sure he was

4

"not under the influence of any kind of methamphetamine or anything like that, okay."

Before having defendant exit the car, Officer Piceno again asked if defendant had any weapons on him or anything illegal. Piceno then asked defendant for consent to search his person to make sure he had nothing illegal on him, to which defendant responded, "Umm, yeah." Piceno had defendant exit the car and place his hands behind his back, then walked defendant to the patrol car. For safety reasons,[2] Piceno conducted a pat search before conducting the eye examination. During the pat search, Piceno found methamphetamine and a "weed vape pen" in defendant's front right pants pocket and a loaded firearm in his front left pants pocket. Defendant was arrested, and a search of his car produced more methamphetamine and an open box of ammunition that was later found to have matched defendant's gun.

Officer Piceno transported defendant to the police station, and there he proceeded with his DUI investigation. Based on his testing, Piceno formed the opinion that defendant was under the influence of a controlled substance. Defendant refused Piceno's request to provide a blood sample.

## 2. The Traffic Stop Was Not Unduly Prolonged

Whether a traffic stop was unlawfully prolonged is an inquiry subject to now-familiar principles. " 'A seizure for a traffic violation justifies a police investigation of that violation. [Citation.] A traffic stop begins once the vehicle is pulled over for investigation of the traffic violation.' " (*People v.*

---

[2]    As Officer Piceno explained, an officer conducting a DUI eye examination during a traffic stop is vulnerable because the suspect is not detained in handcuffs, the officer must stand approximately one to two feet directly in front of the suspect, and the officer's focus is on the suspect's eyes and not on their hands.

5

*Ayon* (2022) 80 Cal.App.5th 926, 936 (*Ayon*).) Ordinarily, "the tolerable duration of police inquiries in the traffic-stop context" is the time it takes "to address the traffic violation that warranted the stop" and "attend to related safety concerns." (*Rodriguez v. United States* (2015) 575 U.S. 348, 354.) This typically includes "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." (*Id.* at p. 355.)

At the same time, "[c]ircumstances which develop during a detention may provide reasonable suspicion to prolong the detention." (*People v. Russell* (2000) 81 Cal.App.4th 96, 102 (*Russell*).) Though a permissible investigative stop has no set time limit, " 'the question is whether the police diligently pursued a means of investigation reasonably designed to confirm or dispel their suspicions quickly.' " (*Ayon, supra*, 80 Cal.App.5th at p. 937 [citing *Russell*, at p. 102].) In the context of a traffic stop, courts assess whether a defendant's detention "was unduly prolonged *in order to* accommodate the officers' investigation of something that fell outside the mission of the stop or attending to related safety concerns." (*People v. Esparza* (2023) 95 Cal.App.5th 1084, 1095 (*Esparza*).)

In reviewing a suppression ruling, we are mindful that the trial court is vested with the power to judge witness credibility, resolve testimonial conflicts, weigh evidence, and draw factual inferences, and that all presumptions favor the proper exercise of that power. (*People v. James* (1977) 19 Cal.3d 99, 107 (*James*).) We defer to the trial court's factual findings if they are supported by substantial evidence, meaning evidence that is " 'reasonable, credible, and of solid value.' " (*People v. Elder* (2017) 11 Cal.App.5th 123, 130 (*Elder*).) Critically, however, " [w]e exercise our independent judgment in determining whether, on the facts presented, the

search or seizure was reasonable under the Fourth Amendment.' " (*People v. Silveria and Travis* (2020) 10 Cal.5th 195, 232.)

There is no question that Officer Piceno initiated a lawful traffic stop based on the vehicle's missing license plate. After pulling defendant over, and within a minute of making contact, Piceno observed defendant's "glassy watery eyes," his visible sweating, and "brown or burnt type substance" on his fingertips. Based on these observations, and informed by his training and field experience,[3] Piceno immediately suspected defendant of criminal activity, i.e., he had been driving while under the influence of a controlled substance. Thus, circumstances had developed during the traffic stop that provided reasonable suspicion to prolong the detention (*Russell*, *supra*, 81 Cal.App.4th at p. 102), and Piceno had grounds to extend the detention for a short period of time to verify or dispel that suspicion (see *Florida v. Royer* (1983) 460 U.S. 491, 500 (plur. opn. of White, J.)).

At approximately six minutes into the stop, dispatch cleared defendant's identification and registration papers and confirmed he was not

---

[3] At the suppression hearing, Officer Piceno testified that his relevant training included the following: during his six-months at the Police Officer Standards and Training academy, he received "approximately 10 to 20 hours" of drug or drug use investigative training where he "identified different types of substances and what the effects it had on individuals"; in the Napa County Sheriff's Office, he received in-house training from "drug recognition experts" who taught and showed him "the signs and symptoms related to drug usage" and what would be "common in Napa County"; he completed an additional course in standardized field sobriety testing that was conducted by the Fairfield Police Department; and he completed an "ARIDE" field sobriety test course in Fairfield, which entailed identifying individuals who may be impaired by use of multiple controlled substances. Out in the field, Piceno had come into contact—more than a hundred times—with individuals suspected of being under the influence of controlled substances. A number of these contacts occurred during traffic stops.

7

on probation.  Piceno then acted on his suspicions and asked defendant how long it had been since he used drugs and what type of drugs he used.  At about seven-and-a-half minutes into the stop, Piceno informed defendant he was going to pull him out of the car to "check [his] eyes real quick to make sure [he was] not under the influence of any kind of methamphetamine" and then obtained defendant's consent to search his person.  Within two minutes of having defendant exit the car, Piceno conducted a patdown.  He found the methamphetamine and loaded pistol in defendant's pockets within 10 minutes of initiating the traffic stop.  On this record, we conclude the traffic stop was not impermissibly prolonged.

*Esparza, supra*, 95 Cal.App.5th 1084, is instructive.  There, the appellate court found the defendant's detention following a lawful traffic stop was not unduly prolonged in order to accommodate an officer's investigation of something that fell outside the mission of the stop and his attendance to related safety concerns.  As the court observed, the officer was focused on three things simultaneously—"completing the mission of the [traffic] stop" (which included checking the defendant's license), "ensuring officer safety" (the occupants of the car outnumbered the two officers initiating the stop), and conducting additional questioning of a different vehicle occupant (who disclosed a previous arrest for drug possession) while waiting for "backup." (*Id*. at pp. 1096–1097.)  The total time between the initial stop of the defendant's car and his pat search was about seven minutes.  (*Id*. at p. 1098.) Here, as in *Esparza*, Officer Piceno's conduct in furthering the mission of the traffic stop, his questioning of defendant based on reasonable suspicion of a DUI offense, and the duration of his DUI investigation (which extended the traffic stop by four minutes once dispatch cleared defendant's paperwork) did not unduly prolong the stop or otherwise render it unlawful.

In arguing to the contrary, defendant points out that Officer Piceno failed to diligently write a citation and repeated questions unrelated to the traffic infraction, even after the mission to address the traffic violation was over. And, he contends, Piceno's testimony did not suffice to establish circumstances supporting a reasonable suspicion to prolong the detention, because the BWC video does not support Piceno's claimed observation of his "glassy watery eyes" and visible sweating. He further emphasizes that Piceno did not have him exit the vehicle for DUI testing until seven minutes after initiating the stop, "even though there was a clear opportunity to perform the testing while Piceno waited for the background check from dispatch." According to defendant, Piceno's failure to perform DUI testing while waiting for information from dispatch "substantially shows the lack of diligence" of his investigation and supports a finding that the detention was unlawfully prolonged. We cannot agree.

Defendant offers no authority suggesting that Officer Piceno's conduct unlawfully prolonged the traffic stop. His reliance on *Ayon*, *supra*, 80 Cal.App.5th 926, is unavailing. There, officers stopped the defendant's car for two minor traffic violations and transmitted driver's license and vehicle registration to dispatch. (*Id*. at p. 930.) At approximately 3-and-a-half minutes into the stop, dispatch reported the validity of the defendant's documents, but an officer continued to engage in conversation with the defendant. (*Id*. at p. 932.) After the defendant refused the officer's request for consent to search his car, the officer requested the assistance of a " 'narco dog.' " (*Ibid*.) A narcotics dog and his handler arrived approximately 13 minutes into the stop, and at approximately 19 minutes the dog alerted to an area of the defendant's car." (*Id*. at p. 933.)

9

The *Ayon* court's reasons for invalidating the search and resulting seizure included the following circumstances:  body camera video contradicted the officer's testimony and undermined his credibility on key points, such as whether the defendant's conduct established reasonable suspicion or probable cause to believe he was under the influence of a controlled substance (*Ayon*, *supra*, 80 Cal.App.5th at pp. 940–941, 943–944); the officers failed to diligently address the traffic infractions which prompted the initial stop, as evidenced by the fact that no officer began writing a traffic citation (*id*. at p. 938); there was "no evidence that anything transmitted by the dispatcher"—which occurred three minutes and 32 seconds into the stop—"would have justified further investigation" (*ibid*.); and more than 18 minutes had elapsed from the start of the stop to the dog's alert (*id*. at p. 938).

*Ayon* is plainly distinguishable.  In contrast to *Ayon*'s facts, the record here provides no basis for second-guessing the trial court's implicit findings that Officer Piceno truthfully testified at the suppression hearing and that his testimony regarding defendant's physical condition was credible.  (See *James*, *supra*, 19 Cal.3d at p. 107.)  We have viewed the BWC video, which appears to support Piceno's description of defendant's eyes as glassy or watery.  Though we cannot tell from the video whether defendant was visibly sweating, the video does not affirmatively undermine Piceno's testimony on this point or the trial court's assessment of Piceno's credibility.  And notably, defendant does not challenge Piceno's additional testimony that defendant had brown, burnt-looking fingertips indicative of drug use.[4]  Thus, we defer to

---

[4]      Defendant appears to challenge the extended detention because, as in *Ayon*, there was no evidence and no court finding that he exhibited conduct such as slurred or irregular speech, an inability to walk or stand normally, confusion, or other mental incapacity.  But Officer Piceno did not purport to

the trial court's findings regarding Piceno's credibility and his observations during the stop. (*Elder*, *supra*, 11 Cal.App.5th at p. 130.)

Accepting the trial court's assessment of Officer Piceno's credibility, we find his testimony sufficient to establish that circumstances immediately arose that provided reasonable suspicion for prolonging what otherwise might have been a routine traffic stop. This distinguishes the situation in *Ayon*, where there was no substantial and credible evidence of a drug-related offense yet the officers detained the defendant for 19 minutes as they called for a narcotics dog and conducted a sniff search. Here, the time that elapsed from the start of the traffic stop to the discovery of contraband on defendant's person was approximately 10 minutes. It took approximately five minutes for Officer Piceno to initiate and complete the standard identification and vehicle registration check. And both before and after Piceno received the dispatch report, he acted on his suspicion of a DUI offense by inquiring into defendant's most recent drug use and whether he had methamphetamine or weapons on his person or in the car. At the seven-and-a-half-minute mark, Piceno removed defendant from the car for the purpose of DUI testing, walked him to the patrol car, and conducted a search to which defendant had consented before the anticipated testing.[5]

---

base his suspicions on such conduct, so the BWC video did not contradict or otherwise undermine his testimony. Defendant offers no authority suggesting that an officer with Piceno's level of drug-detection training and field experience could not form reasonable suspicion of a person's intoxicated condition based on the observations Piceno reported.

[5] That defendant was never issued a citation for the missing license plate or charged with driving under the influence does not compel a different outcome. As explained, none of the steps in the detention unduly prolonged the detention.

Neither *Ayon* nor any other authority cited by defendant purports to find an unlawfully prolonged stop on facts such as these. Rather, as the record reflects, circumstances had developed during the traffic stop that provided reasonable suspicion for Officer Piceno to extend the detention based on his suspicion that defendant had been driving under the influence, and the resulting investigation was conducted within a reasonable amount of time. (See *Arizona v. Johnson* (2009) 555 U.S. 323, 333; *Esparza, supra*, 95 Cal.App.5th at pp. 1093–1098.) In sum, we conclude the traffic stop was not unlawfully prolonged.

### 3. Defendant's Consent Was Valid

Courts have recognized that valid consent has two components. First, it must be free and voluntary rather than a mere submission to a claim of lawful authority or the result of coercion and duress. (*People v. Zamudio* (2008) 43 Cal.4th 327, 341 (*Zamudio*).) Second, the consent cannot have resulted from unlawful police activity, such as an illegal detention. (*Ibid*.) We have already rejected defendant's claim that the officers conducted an illegal, unduly prolonged traffic stop. (See part A.2, *ante*.) We therefore assess the voluntariness of defendant's consent.

In making this assessment, we consider the totality of the circumstances. (*Zamudio, supra*, 43 Cal.4th at p. 341.) As defendant observes, factors relevant to the voluntariness inquiry include whether there was an application of force, intimidating movement, an overwhelming show of force, brandishing of weapons, blocking of exits, threats, commands, or authoritative tone of voice. (*United States v. Drayton* (2002) 536 U.S. 194, 204 (*Drayton*) [identifying such factors in considering the voluntariness inquiry]; see also *United States v. Watson* (1976) 423 U.S. 411, 424 (*Watson*) [suggesting promises and "more subtle forms of coercion" might be found to

12

flaw one's judgment].) Consent to a search may be voluntary, even if the defendant was in custody or under arrest at the time consent was given. (E.g., *Watson*, at p. 424; *People v. Monterroso* (2004) 34 Cal.4th 743, 758 (*Monterroso*).) "[W]e view the record in the light most favorable to the trial court's ruling, deferring to those express or implied findings of fact supported by substantial evidence." (*People v. Jenkins* (2000) 22 Cal.4th 900, 969.)

Here, there is substantial evidence supporting the voluntariness of defendant's consent. As the BWC video confirms, Officer Piceno did not demand to search but clearly sought defendant's consent. Piceno did not get upset or act in a threatening manner when defendant first refused consent; instead, Piceno fully respected that refusal. When Piceno renewed his request before removing defendant from the car, he did so in a professional manner and defendant readily agreed. As the BWC video also shows, there was no show of force, weapons, threats, or intimidation marking the events leading up to second request (see *Drayton, supra*, 536 U.S. at p. 204), and no indication of promises or other "more subtle forms of coercion" (*Watson, supra*, 423 U.S. at p. 424).

Nonetheless, defendant contends Officer Piceno used an "authoritative" and "commanding" tone when he told defendant he was going to pull him out of the car to check his eyes. Starting from this premise, defendant claims his affirmative response to Piceno's second search request was "a resignation to the circumstances rather than a voluntary consent." We cannot agree.

Even accepting that Officer Piceno used a more authoritative voice in making his second request, it remains the case that none of the other factors described in *Drayton* supports a finding of coercion or duress. Considering the totality of the circumstances (*Zamudio, supra*, 43 Cal.4th at p. 341), we agree with the trial court's finding of voluntariness. Indeed, consent searches

13

have been upheld under seemingly more coercive circumstances than those here. (E.g., *Watson, supra,* 423 U.S. at pp. 424–425 [defendant's consent to search car secured after he had just been arrested and personally searched]; *Monterroso, supra,* 34 Cal.4th at p. 758 [defendant arrested and in handcuffs in patrol vehicle]; *People v. Ratliff* (1986) 41 Cal.3d 675, 685–687 [defendant was handcuffed and officers initially had their guns drawn].)

Having concluded that defendant's consent to the search of his person was valid, we need not address defendant's claims that the pat search was not based on reasonable suspicion and that even if it were, Officer Piceno exceeded the scope of the search.

## B. *Romero* Motion

Defendant contends the trial court erred in denying his *Romero* motion for his 1997 strike prior. Though defendant does not dispute the felony underlying that conviction was serious and qualified as a strike prior under the Three Strikes law, he emphasizes it was a nonviolent felony committed 28 years ago when he was 23 years of age.

### 1. Background Facts

Defendant obtained the strike prior for making criminal threats in 1996 (§ 422), for which he ultimately served eight months in prison. As detailed below, defendant's adult criminal history is lengthy and includes two convictions predating, and many others postdating, that strike prior.[6]

In 1991, defendant committed two misdemeanors—theft (§484, subd. (a)) and tampering with a motor vehicle (Veh. Code, § 10852). He was placed on three years of probation conditioned on serving nine days in jail.

---

[6]     Though included in the sealed probation report (§ 1203.5), information concerning defendant's criminal history is not confidential.

In 1996, a few months after committing his strike prior, defendant committed another misdemeanor theft (§ 484, subd. (a)) and was placed on three years of probation conditioned on serving 30 days in jail.

In 1997, defendant was convicted of vehicle theft (Veh. Code, § 10851, subd. (a)) and carrying a concealed weapon (§ 12025, subd. (a)(1)) and was sentenced to three years in prison. He violated parole twice and returned to prison to finish his term.

In 2004, defendant committed felonies on two separate occasions. The first time he was charged and convicted for being a felon or addict in possession of a firearm (§ 12021, subd. (a)(1)), and he was sentenced to 16 months in prison. He later violated parole and returned to prison to finish his term. The second time he was charged and convicted for sale or transportation for sale of a controlled substance (Health & Saf. Code, § 11379, subd. (a)), and he received a four-year prison sentence.

In 2011, defendant received a felony conviction for possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), for which he received a two-year prison sentence. He also received a misdemeanor conviction for possession of drug paraphernalia (Health & Saf. Code, § 11364, subd. (a)), for which he received a three-day jail sentence. Defendant violated the terms of his Post Release Community Supervision ("PRCS") at least twice and was returned to jail to serve 180 days each time

In 2013, defendant again suffered a felony conviction for possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)), as well as a misdemeanor conviction for possession of drug paraphernalia (Health & Saf. Code, § 11364, subd. (a)). He again received a two-year prison sentence for the felony conviction and a 180-day jail sentence for the misdemeanor.

In 2015, defendant committed two more misdemeanors—carrying a concealed firearm (§ 25400, subd. (a)(1)) and possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a))—for which he received three years probation.

In 2016, defendant committed the felony offense of being a felon in possession of a firearm (§ 29800, subd. (a)) and misdemeanor possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).  He received a two-year prison sentence for the felony.

In 2017, defendant committed an infraction and a misdemeanor unregistered driver offense (Veh. Code, § 4000, subd. (a)) and possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)).

Two months later in 2017, defendant committed five felony and two misdemeanor offenses:  possession of narcotics while armed (Health & Saf. Code, § 11370.1, subd. (a)); being a felon in possession of ammunition (§ 30305, subd. (a)); being a felon in possession of a firearm (§ 29800, subd. (b)); being a prohibited person carrying a loaded firearm in public (§ 25850, subd. (c)(4)); being a prohibited person carrying a concealed firearm (§ 25400, subd. (c)(4)); possession of a controlled substance (Health & Saf. Code, § 11350, subd. (a)); and possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a)).  Defendant received a six-year prison sentence and was discharged from PCRS in 2021.

Following his 2023 convictions on the underlying offenses, defendant filed a *Romero* motion seeking dismissal of his 1997 strike prior and requesting the opportunity to participate in Drug Court.  Though admitting he spent much of adult life in and out of criminal custody, he contended the age and "unaggravated" nature of the strike prior and current offenses demonstrate he falls outside the spirit of the Three Strikes Law and that

16

dismissal of the strike prior would further the interests of justice. Pointing out that "drugs have been related in almost every one of his convictions," defendant claimed he was "at the age where he is ready to become clean and sober." The People countered that defendant's drug addiction was not an appropriate consideration because it is a longstanding problem for which defendant has been unwilling to obtain treatment or follow through in efforts to control it.

The trial court denied the motion and imposed an aggregate six-year prison sentence. Finding that defendant was "a lifetime recidivist" who had "not been able to stay out of trouble for very long," the court emphasized that defendant was "not someone who is simply a drug dealer to support his habit, this is someone using methamphetamine, carrying a loaded gun and selling drugs."

## 2. Analysis

Pursuant to section 1385 and *Romero, supra,* 13 Cal.4th 497, trial courts have discretion to dismiss strike prior convictions, which includes the discretion to dismiss the same strike prior allegations as to some counts but not as to others. (*People v. Garcia* (1999) 20 Cal.4th 490, 499–502.) A court may grant a dismissal only upon finding it is "in furtherance of justice." (§ 1385, subd. (a).)

In ruling on a motion for relief from the Three Strikes law, a trial court " 'must consider whether, in light of the nature and circumstances of [a defendant's] present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies.' " (*People v. Carmony* (2004) 33

17

Cal.4th 367, 377 (*Carmony*).) "[T]he circumstances must be '*extraordinary* . . . by which a career criminal can be deemed to fall outside the spirit of the very scheme within which he squarely falls once he commits a strike as part of a long and continuous criminal record, the continuation of which the law was meant to attack.' " (*Id.* at p. 378, italics added.)

We review a trial court's ruling on a *Romero* motion for abuse of discretion, i.e., whether the court's decision is "so irrational or arbitrary that no reasonable person could agree with it." (*Carmony*, *supra*, 33 Cal.4th at p. 377.) A denial of a *Romero* motion must be reversed where the court "was not 'aware of its discretion' " to grant a *Romero* motion or where it "considered impermissible factors in declining to dismiss." (*Carmony*, at p. 378.) But where the record is silent or where it " 'demonstrates that the trial court balanced the relevant facts and reached an impartial decision in conformity with the spirit of the law,' " we will affirm the court's ruling, " 'even if we might have ruled differently in the first instance.' " (*Ibid.*)

Here, the record contains no hint of an abuse of discretion. Rather, it shows that the trial court was aware of its discretion to grant a *Romero* motion and that it properly considered the relevant information and factors in denying relief. Though the court heard and considered the defense's case in mitigation, the court reached its decision after highlighting defendant's lengthy criminal history and his inability "to stay out of trouble for very long." Given defendant's history, as recounted above, the court reasonably concluded that defendant's failure or refusal to learn his lesson—despite multiple convictions, prison and jail sentences, and returns to custody— indicated he was the kind of " 'career criminal' " that the Three Strikes law was designed to target. (*Carmony*, *supra*, 13 Cal.4th at p. 378.) And where, as here, a relatively remote strike prior is at issue, a court may properly find

18

such factor "insignificant" when the defendant "did not refrain from criminal activity during that span of time." (*People v. Williams* (1998) 17 Cal.4th 148, 163.)

Defendant's reliance on *People v. Avila* (2020) 57 Cal.App.5th 1134 (*Avila*) is unavailing. There, the trial court denied the defendant's *Romero* motion to dismiss two strike priors. In finding the court abused its discretion, the *Avila* court included the following conclusions in its analysis. First, the trial court appeared to agree the strike priors were remote in time (preceding his current convictions by 28 and 26 years) but seemed to question whether such remoteness could be considered. (*Id.* at p. 1141.) Second, the trial court mistakenly believed it could not consider that defendant was under age 21 at the time of the strike priors as a mitigating factor. (*Id.* at pp. 1141–1142.) Third, the trial court went beyond consideration of appropriate factors when it speculated about what might have happened in the current attempted robbery and attempted extortion offenses had the police not been called, and it erred in mischaracterizing those offenses as violent crimes. (*Id.* at pp. 1142–1143.) Fourth, because the defendant was 47 years old when sentenced, the *Avila* court observed his Three Strikes sentence, coupled with the determinate term he received, meant "he will likely die in prison," which was an "unjust" consequence the trial court appeared not to consider. (*Id.* at p. 1144.) In the words of the *Avila* court, "no reasonable person could agree that the sentence imposed on Avila was just." (*Id.* at p. 1145.)

*Avila* is amply distinguishable. Unlike the situation in *Avila*, the record here reflects no misunderstanding by the trial court regarding its discretion. The court acknowledged that defendant's strike prior dated back to 1996, but agreed with the People that defendant is "a lifetime recidivist"

19

who persisted in committing crimes involving theft, possession of weapons and ammunition, and drug distribution crimes. Moreover, the trial court "is presumed to have considered all of the relevant factors in the absence of an affirmative record to the contrary" (*People v. Myers* (1999) 69 Cal.App.4th 305, 310), and unlike the facts in *Avila*, the record here contains no indication the court did not consider defendant's age at the time of the strike prior. Additionally, the trial court here applied its sentencing discretion to impose an aggregate sentence of six years; though not insubstantial, the sentence does not mean defendant will likely die in prison.

Contrary to defendant's suggestion, the trial court here did not engage in improper speculation regarding what might have happened had Officer Piceno not stopped defendant's car. (See *Avila, supra*, 57 Cal.App.5th at p. 1142.) Rather, the court reasonably concluded that "someone using methamphetamine, carrying a loaded gun and selling drugs" *is engaging in* "very, very dangerous behavior."

Finally, though *Avila* acknowledged that a drug problem may be considered as a mitigating factor, the defendant there had demonstrated a measure of success with drug treatment before medical issues caused him to relapse. (*Avila, supra*, 57 Cal.App.5th at p. 1144.) Here, however, the record indicates defendant had not engaged in any drug treatment despite having used drugs and committing drug-related offenses throughout his life. Rather than pointing to any evidence of previous participation or success with treatment, the most the defense offered was the comment that defendant was now "at the age where he is ready to become clean and sober" and that, if allowed at this point to participate in Drug Court, he "would be able to actually get intensive drug treatment at the local level, rather than just going back to prison, getting out, and being back where he started." We are not

20

persuaded. Even assuming another jurist could reasonably have ruled differently, we cannot say that no reasonable jurist would have denied the *Romero* motion based on all the evidence in this record. (See *Carmony*, *supra*, 33 Cal.4th at p. 377.)

In sum, the trial court did not abuse its discretion in finding that defendant did not fall outside the spirit of the Three Strikes law.

**DISPOSITION**

The judgment is affirmed.

_____
Fujisaki, J.

WE CONCUR:

_____
Tucher, P. J.


_____
Petrou, J.


*People v. Osotuno* (A169562)